## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF NEW MEXICO

JAIME DIAZ,

       Plaintiff,

v.                                                              No. Civ. 14-922 JCH/LAM

NEW MEXICO STATE POLICE OFFICERS
JASON WRIGHT, MATHEW ROMERO,
CORY CRAYTON, and JOHN WHITE,
And SIERRA COUNTY DETENTION FACILITY
ADMINISTRATOR CURTIS CHERRY,

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

On April 30, 2015 Defendant New Mexico State Police Officers Jason Wright, Mathew Romero, Cory Crayton, and John White (collectively, "Defendant Officers") filed a Motion for Summary Judgment on Qualified Immunity (ECF No. 47). The Court, having considered the motion, briefs, evidence, applicable law, and otherwise being fully advised, concludes that the Defendant Officers are entitled to summary judgment and qualified immunity on Plaintiff's claims.

## I.    FACTUAL BACKGROUND

On the night of July 6, 2013, Defendant Officers received a dispatch reporting that a woman had been run over and dragged by a vehicle in a hit and run accident near the front entrance to Elephant Butte State Park (the "Park"). Defs.' Mot., Undisputed Fact ("UF") ¶¶ 1-2, ECF No. 47; Aff. of Cory Crayton ¶ 3, ECF No. 47-2. The vehicle belonged to Frank Beltran. Defs.' Mot., UF ¶ 1, ECF No. 47.

Then-New Mexico State Police ("NMSP") Sergeant Matthew Romero drove towards the

main entrance of the Park to try to locate the suspect vehicle. *Id.*, UF ¶ 2. While driving, Sergeant Romero learned a woman had been hurt and there was a crowd gathering. *Id.* Officer Johnathan White was also pursuing the vehicle. *Id.* Sergeant Romero was the first officer to arrive on scene. *Id.*, UF ¶ 4. He observed an emergency vehicle and EMTs tending to a woman down on the ground. *Id.* He also saw a large man, who he later learned to be Plaintiff Jaime Diaz, yelling at the EMTs and everyone else. *Id.* Sergeant Romero believed that Plaintiff was interfering with the EMTs' work, so he asked Plaintiff to come talk to him. *Id.*, UF ¶ 5.

While people from the crowd were pressing in, Mr. Diaz ranted and raved, yelling at Sgt. Romero to "fucking get that guy," and calling Sgt. Romero a "fucking pussy." *Id.*, UF ¶ 6. Sgt. Romero tried to calm Mr. Diaz while trying to figure out what had happened. *Id.* Sgt. Romero could smell a strong odor of alcohol on Mr. Diaz's breath. *Id.*, UF ¶ 7. As Mr. Diaz yelled and cursed at Sgt. Romero, spit flew from his mouth. *Id.* Mr. Diaz was extremely physically imposing. *Id.*, UF ¶ 8. Based on Mr. Diaz's demeanor and behavior, it appeared that Mr. Diaz might assault Sgt. Romero at any moment. *Id.* He was so out of control that Officer Adrian Salas, fearing for Sgt. Romero's safety, asked Sgt. Romero if he wanted Officer Salas to place Plaintiff in custody for, at a minimum, disorderly conduct. *Id.*

Given the size difference between Sgt. Romero, who is 5 feet 7 inches, and Plaintiff, who is much larger and muscled, Sgt. Romero decided against attempting to arrest Plaintiff at that time for disorderly conduct, because he was concerned he would not be able to control Plaintiff without resorting to his mace or Taser. *Id.*, UF ¶¶ 9, 13. He also did not want to escalate the situation, fearing that other angry, intoxicated family members there with Plaintiff might start a riot. *Id.*, UF ¶ 10. Plaintiff continued to act in an extremely aggressive manner towards Sgt. Romero. *Id.*, UF ¶ 11. Sgt. Romero believed that Plaintiff might attack him, so he told Plaintiff

that he needed to back off or he would taze him, to which Plaintiff responded, "Go ahead and fucking taze me." *Id.*

During this time, additional officers began to arrive at the scene. *Id.*, UF ¶ 12. From past experience, Sgt. Romero knew that Officer Crayton was adept at calming people, so he asked Officer Crayton to take a statement from Plaintiff, but he had Officer Wright keep watch on them. *See id.* Officer Crayton observed that Plaintiff was acting loudly and obnoxiously, appeared drunk, and seemed to be looking for a fight. *Id.*, UF ¶ 13.

As Officer Crayton attempted to calm Plaintiff, another man accompanied him. *Id.*, UF ¶ 14. Both men were clearly intoxicated and very aggressive, making Officer Crayton uncomfortable. *Id.* Ultimately, Officer Crayton was able to calm Plaintiff enough to get a statement. *Id.*, UF ¶ 15. Plaintiff told Officer Crayton that, after the driver, Mr. Beltran, cut him off, he got out of his vehicle and punched Mr. Beltran four times through the window and punched out the windows of Mr. Beltran's SUV. *Id.*

Officer Crayton interviewed Mr. Beltran's girlfriend and passenger, Christina Coyazo, who stated that Mr. Beltran and Mr. Diaz argued about Mr. Beltran's decision to merge in front of Mr. Diaz's vehicle, that Mr. Diaz pushed his wife into the vehicle and struck Mr. Beltran, and that Mr. Beltran drove away. *See id.*, UF ¶ 16; Aff. for Arrest Warrant, ECF No. 47-8 at 6 of 8. Another eyewitness reported seeing Mr. Diaz punch Mr. Beltran. Def.'s Mot., UF ¶ 17, ECF No. 47; Aff. for Arrest Warrant, ECF No. 47-8 at 6 of 8. Sometime later, Plaintiff drove away from the scene in a car, still yelling "fuck you" out the window at Sgt. Romero. Def.'s Mot., UF ¶ 18, ECF NO. 47.

Based upon the information the officers gathered at the scene, they believed Plaintiff had been the instigator in the altercation and had committed the crimes of disorderly conduct and

battery against Frank Beltran. *Id.*, UF ¶ 20. Officers from the Sierra County Sheriff's Office and the Truth or Consequences Police Department who were at the scene at the Park told the NMSP Officers that Mr. Diaz was notorious for fighting police and would likely fight them at the hospital. *See id.*, UF ¶ 22; Aff. of Johnathan White ¶ 8, ECF No. 47-3. The Defendant Officers returned to the NMSP office to discuss their plans. Def.'s Mot., UF ¶ 21, ECF NO. 47. The Defendant Officers knew Mr. Diaz had gone to the hospital to be with his wife who was injured in the altercation. *See* Aff. of Jason Wright ¶ 13, ECF No. 47-4; Aff. of Cory Crayton ¶¶ 14-15, ECF No. 47-2. They decided to go to Sierra Vista Hospital to detain Plaintiff while they secured an arrest warrant. *Id.*

Sierra Vista Hospital has a small emergency room. Def.'s Mot., UF ¶ 23. Officer Salas had to transport Mr. Beltran to the hospital for a blood draw, and the officers did not want Plaintiff or his family to attack Mr. Beltran. *Id.*, UF ¶¶ 19, 23. When Officer Salas transported Mr. Beltran to the hospital, he observed Mr. Diaz's family gathered outside the emergency room. Aff. of Adrian Salas ¶¶ 9-10, ECF No. 47-5. They were yelling and shouting about Mr. Beltran. *Id.* Officer Salas attempted to keep them calm and outside the emergency room. *Id.* Consequently, in addition to their belief that they had reasonable suspicion to detain Plaintiff to further their investigation, the officers wanted to ensure that Plaintiff was under control and separated from Mr. Beltran. Defs.' Mot., UF ¶ 23, ECF No. 47.

At approximately 11:54 p.m., Sergeant Romero, Officer Jonathan White, Officer Jason Wright, and Officer Clayton arrived at the Sierra Vista Memorial Hospital. *See* Criminal Compl., ECF No. 47-8 at 2 of 8; Aff. of Cory Crayton ¶ 16, ECF No. 47-2. Sgt. Romero was present as the supervisor and for officer safety reasons, but he consciously made an effort to stay behind the other three officers to try not to escalate the situation. Defs.' Mot. UF ¶ 24, ECF No. 47. The

four officers entered the hospital room and Officer White approached Plaintiff, who was sitting

in a wheelchair with an IV hooked in his arm. *See* Aff. of Cory Crayton ¶ 17, ECF No. 47-2;

Dep. of Jaime Diaz 101:1-13, 105:1-19, ECF No. 52-1; Defs.' Ex. F, Hospital Recording, 2:50-

3:18. Mr. Diaz's brother was standing next to him. Dep. of Jaime Diaz 112:17-24, ECF No. 52-1.

Officer White asked if they could ask him some questions. Dep. of Jaime Diaz 28:22-25, 100:16-

24, ECF No. 56-1. Mr. Diaz cursed at the officers and told them, in obscenity-laced terms, that

he was not going to talk to them. *See* Defs.' Ex. F, Hospital Recording, 2:50-3:35.[1] Mr. Diaz said

that he was not going to talk to "you or any of these mother fuckers" until "that fucking pussy

leaves," referring to "that fat mother fucker right there." *Id.* Officer White went over to Mr. Diaz

to place him in handcuffs. *See* Aff. of Cory Crayton ¶ 18, ECF No. 47-2; Aff. of Johnathan

White ¶¶ 10-11, ECF No. 47-3.

Mr. Diaz said, "You gonna handcuff me? Fuck you. You ain't fuckin' gonna handcuff

me. Fuck no, mother fucker." *See* Defs.' Ex. F, Hospital Recording, 2:50-3:35.[2] An officer said,

---

[1] It is unclear if Plaintiff disputes that he yelled and cursed at the officers before the officers forcefully cuffed and restrained him. *See* Pl.'s Resp. ¶ 25, ECF No. 52. The Hospital Recording from 2:50-3:40 captures Mr. Diaz yelling and cursing at the officers. The Court thus finds that Plaintiff's citations to the record do not refute the fact or create a genuine dispute regarding whether Mr. Diaz yelled and cursed at the officers.

[2] Officers Crayton and White averred that Officer White placed his hand on Mr. Diaz's arm to put him in handcuffs, but Mr. Diaz pulled his arm away. Aff. of Cory Crayton ¶ 18, ECF No. 47-2; Aff. of Johnathan White ¶ 11, ECF No. 47-3. Mr. Diaz stated in his deposition, however, that he was compliant with the officers' instructions and did everything that they asked him to do. Dep. of Jaime Diaz 106:6-9, ECF No. 52-1. Mr. Diaz's general statement of compliance with "instructions" is ambiguous as to whether he meant that he also did not pull his arm away. The audio recording does not capture whether any of the officers verbally commanded that he give Officer White his arm so as to be handcuffed. The audio recording captures Mr. Diaz telling the officers in obscenity-laced terms that he was not going to let them handcuff him, which reasonably suggests that Mr. Diaz's general statement that he was compliant may not be credible, and the officers' version of events that he pulled his arm away may have occurred. *See* Def.'s Mot, Ex. F Hospital Recording 2:50-3:46.

      Nevertheless, at this stage, this Court must view all inferences in Plaintiff's favor. A jury could believe Mr. Diaz that he physically complied and did not resist officers' attempts to handcuff him, despite his words and tone. *Cf. Corder v. Denver*, 229 F.3d 1162, at *3 (10th Cir. Aug. 31, 2000) (unpublished opinion) (noting, in analyzing excessive force claim, that while plaintiff was verbally abusive, there had been no physical resistance). The Tenth Circuit has distinguished audio evidence in which portions are unintelligible from an unadulterated videotape that captured the entire incident, as in *Scott v. Harris*, 550 U.S. 372 (2007). *Cf. York v. City of Las Cruces*, 523 F.3d 1205, 1210-11 (10th Cir. 2008) (concluding that officers overstated relevance of *Scott* case where Supreme Court determined that unadulterated videotape blatantly contradicted the plaintiff's version of events, because only part of incident involving York and police officers was captured on audio tape, portions of which were unintelligible).

"So you're resisting," and within approximately 20 to 30 seconds of the officers entering the room, an officer grabbed Mr. Diaz, forcibly slamming him to the ground face first and one or more officers put their knees on the back of his head and neck as they handcuffed him with his arms behind him. *See* Aff. of Jaime Diaz 101:1-13, 105:1-19-106:20, 107:10-108:17, ECF No. 52-1; Defs.' Ex. F 2:50-4:26. Mr. Diaz felt like he was choking. *See* Dep. of Jaime Diaz 105:1-19, 107:10-108:17, ECF No. 52-1. Mr. Diaz said, "I'm not even fucking fighting you." Defs.' Ex. F, Hospital Recording, 2:50-3:35. As he lay on the floor, Mr. Diaz was not struggling. Dep. of Jaime Diaz 105:22-106:1, ECF No. 52-1. At some point during the handcuffing, the IV ripped out of Mr. Diaz's arm. *See* Dep. of Jaime Diaz 105:1-19, ECF No. 52-1; Aff. of Cory Crayton ¶ 19, ECF No. 47-2. An officer then stood Mr. Diaz up. *See* Dep. of Jaime Diaz 107:8-108:7, ECF No. 52-1. At no point did Mr. Diaz try to hit the officers. *See id.* at 105:25-106:5. Mr. Diaz's brother did not get involved in the altercation at all. *See id.* at 112:17-113:7.

Officer White then came up to Mr. Diaz and put his hands around his neck and started choking him. *Id.* at 108:18-24.[3] The officers then put him on an examination bed. *Id.* at 112:13-16. The parties dispute whether Mr. Diaz actively resisted their efforts to restrain him in the exam room.[4] While he was lying on the bed on his back, Officer White stood over him with his

---

Because the audio recording does not show whether Mr. Diaz pulled his arm away from Officer White, and this Court is not permitted to make credibility determinations, the Court will construe the inferences in Mr. Diaz's favor. Consequently, the Court must look at the facts as though Mr. Diaz was physically compliant with the officers. *Compare Scott v. Harris*, 550 U.S. 372, 380-81 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."), *with White v. Martin*, 425 F. App'x 736, 743 (10th Cir. June 8, 2011) (unpublished opinion) (distinguishing *Scott* because videos left open questions about degree of suspect's resistance to arrest and timing and extent of force levied by trooper).

[3] The Defendant Officers dispute that they choked Mr. Diaz and note that he does not allege in his Complaint that any officer choked him. Although Mr. Diaz testified in his deposition that Officer White choked him after an officer stood him up, for the reasons discussed herein, the Court will not consider this fact in light of the lack of legal argument relying on it.

[4] The officers testified Mr. Diaz resisted their efforts to restrain him. *See* Aff. of Cory Crayton ¶¶ 20-21, ECF NO. 47-2; Aff. of Johnathan White ¶ 12. Mr. Diaz disputes that he physically resisted the officers' attempts to secure him, relying on his deposition testimony in which he testified that, in the exam room, he was complying with directions, was not resisting, and was calm and compliant the entire time. *See* Dep. of Jaime Diaz 113:8-114:16,

elbow on Mr. Diaz's neck, choking him. *See id.* at 113:8-114:16; Defs.' Ex. F, Hospital Recording 4:15-8:40. At the time, Mr. Diaz was yelling and cursing at the officers and medical personnel. *See* Defs.' Ex. F, Hospital Recording 4:15-8:40.

Officer Wright remained with Plaintiff at his bedside. Aff. of Jason Wright ¶ 19, ECF No. 47-4. The medical staff attempted to get an x-ray of Mr. Diaz. See Defs.' Ex. F, Hospital Recording 4:15-9:15, and T or C Police Lapel Camera Recording. At some point, several officers from the Truth or Consequences Police Department arrived and assisted Officer Wright in restraining Plaintiff on the bed. *See* Aff. of Jason Wright ¶ 19, ECF No. 47-4; Defs.' Ex. F, T or C Police Lapel Camera Recording. While restrained on the bed, Plaintiff cursed at Officer Wright. *See* Aff. of Jason Wright ¶ 19, ECF No. 47-4; Ex. F, T or C Police Lapel Camera Recording. Mr. Diaz's wife, Amber, entered the room and tried to calm him down. *See* Aff. of Jason Wright ¶ 19, ECF No. 47-4; Defs.' Ex. F, T or C Police Lapel Camera Recording.[5] A doctor sedated Mr. Diaz after the officers restrained him in bed. *See* Aff. of Jason Wright ¶ 20, ECF No. 47-4; Defs.' Ex. F, T or C Police Lapel Camera Recording.

Officer Crayton then returned to the state police office in Truth or Consequences to

---

ECF No. 52-1. However, when asked in his deposition if he was cursing or swearing or spitting, or if he could have been violent, Mr. Diaz replied that he did not remember. *See* Dep. of Jaime Diaz 113:8-114:23, ECF No. 52-1. When asked by counsel, "During the time that you're in this exam room, are you calm and compliant the entire time?" Mr. Diaz responded, "I don't remember." *Id.* 114:19-21. Mr. Diaz's subsequent statement that he did not remember if he was calm and compliant the entire time in the examination room contradicts his earlier statement that he was calm and compliant. The audio recording also captures Mr. Diaz's angry outbursts in the examination room, as does the video recording which captures the later sequence of events while Mr. Diaz was on the examination table. As explained *infra*, the Court need not determine whether Mr. Diaz has sufficiently refuted Defendants' purported undisputed fact that he actively resisted arrest, because Plaintiff has limited his excessive force claim to his forcible takedown from the wheelchair and handcuffing.

[5] Mr. Diaz disputes that he continued cursing and calling Officer Wright names, relying on his deposition statement that he was compliant. While he was lying on the examination bed, however, there is video evidence from an officer's lapel camera, taken sometime after Amber entered the room and while medical personnel were taking the x-ray, showing Mr. Diaz yelling and cursing at Officer Wright, and attempting to resist his efforts to keep his leg down and restrained. *See* Ex. F, T or C Police Lapel Camera Recording. The Court finds that Mr. Diaz's statement that he was "compliant" does not create a genuine issue of fact to dispute Defendants' fact that Mr. Diaz cursed and called Officer Wright names, given the clear video evidence showing Mr. Diaz cursing at Officer Wright and that Mr. Diaz in his deposition also stated he did not remember whether he was calm and compliant the entire time.

prepare an affidavit, arrest warrant, and criminal complaint for crimes including those that occurred at the Park before officers arrived. Aff. of Cory Crayton ¶¶ 21-22, ECF No. 47-2. Officer Crayton spoke to Assistant District Attorney ("ADA") Ray Sharbutt to discuss the appropriate charges, including battery of Mr. Beltran, damage to his vehicle, and charges based on his conduct at the hospital. Defs.' Mot., UF ¶ 40, ECF No. 47. Officer Crayton read the affidavit to Mr. Sharbutt over the phone, and ADA Sharbutt approved the charges. *Id.*

Meanwhile, Sgt. Romero went outside to help Officer Salas calm angry family members who continued to be disruptive. *Id.*, UF ¶ 38. The officers still had to obtain a blood draw from Mr. Beltran, who was handcuffed in the backseat of Officer Salas' car, and they did not want to bring Mr. Beltran inside until Plaintiff's volatile family members dispersed. *See id.* After Mr. Beltran's blood was drawn, Officers White and Salas returned to the NMSP office. *Id.*, UF ¶ 39.

Officer Crayton in the early hours of the morning on July 7, 2013, called then-Sierra County Magistrate Judge Thomas Pestak, who said he was in Cloudcroft, New Mexico on vacation and did not have access to a fax machine. *See id.*, UF ¶¶ 41-43; Aff. of Cory Crayton ¶ 23, ECF No. 47-2. Judge Pestak informed Officer Crayton it was not necessary to contact another judge because he could telephonically approve the warrant. Defs.' Mot., UF ¶ 41, ECF No. 47. Judge Pestak swore in Officer Crayton, who then read the affidavit over the telephone, in which Officer Crayton described the following factual basis for the arrest of Plaintiff: When Officer Crayton arrived at the Park in response to a call about a woman being dragged, Mr. Diaz was acting loud and boisterous, was cussing at Sergeant Romero and a Sheriff Deputy, and smelled of alcohol; Mr. Diaz admitted to Officer Crayton that he punched Mr. Beltran three times after a hit and run incident with Mr. Beltran's vehicle, and that, after he hit Mr. Beltran a fourth time, Mr. Beltran drove off while grabbing Mr. Diaz's wife's hair, dragging her along

while driving; Mr. Diaz confessed to then running towards the vehicle and punching out glass windows of the vehicle. *Id.*, UF ¶ 42; Aff. for Arrest Warrant, ECF No. 47-8 at 5-6 of 8.

On July 7, 2013, at around 2:25 a.m., Judge Pestak instructed Officer Crayton to note his telephonic approval on the warrant to arrest Plaintiff for battery and tampering with a vehicle, and to put the bond amount at $5,000. *See* Defs.' Mot., UF ¶ 43, ECF No. 47. Officer Crayton on the signature line for "BOND" wrote "$5,000 CASH" and next to "Judge," he wrote "PESTAK (TELEPHONIC)." Warrant for Arrest, ECF No. 47-8 at 4 of 8. The warrant said there was probable cause to bring defendant "without unnecessary delay" before the court to answer the charges of battery, petty misdemeanor, and tampering or injuring a vehicle, misdemeanor. *Id.* Judge Pestak never signed the warrant himself. *Id.*

After Officer Crayton obtained the warrant, he traveled to the Sierra County Detention Center where he met Officer Wright, who had transported Mr. Diaz there from the hospital. Defs.' Mot., UF ¶ 44, ECF No. 47. Plaintiff was booked into the Sierra County Detention Facility early in the morning of July 7, 2013. *Id.* Officers Crayton and Wright provided jail staff with copies of the warrant, affidavit, and aftercare medical instructions from the hospital. *Id.*, UF ¶ 45. Officer Crayon also filled out an arrest/booking report. *Id.*

On July 8, 2013, the NMSP officers filed the Criminal Complaint against Plaintiff detailing facts supporting his arrest and prosecution for battery; tampering/injuring a vehicle; disorderly conduct; resisting, evading or obstructing an officer; and assault upon a peace officer. *Id.*, UF ¶ 46. They also filed the warrant and affidavit. *Id.*

On July 23, 2013, unbeknownst to the NMSP officers, Deputy District Attorney Mercedes Murphy filed a Nolle Prosequi in Mr. Diaz's case on grounds "that at this time, New Mexico law does not provide for telephonic warrants and the defendant's warrant did not contain

the judge's signature" and dismissed the case "without prejudice." Nolle Prosequi, ECF No. 42-1; Defs.' Mot., UF ¶ 47, ECF No. 47. That same day, Mr. Diaz was released. *See* Pl.'s Resp. ¶ 5, ECF No. 42.

On September 23, 2013, Plaintiff sent a Tort Claims Notice. Defs.' Mot., UF ¶ 48, ECF No. 47. Several months later, Sgt. Romero learned that the District Attorney's office had dismissed the charges without prejudice; however, no one from that office had informed any of the officers about the dismissal. *Id.*, UF ¶ 49. Sgt. Romero called and emailed Mercedes Murphy multiple times regarding the dismissal, and met with her in person to dispute the invalidity of the warrant. *See id.*, UF ¶ 50. After several conversations and meetings, ADA Murphy agreed to allow the officers to re-file the charges. *Id.*, UF ¶ 51. Sgt. Romero instructed Officer Crayton to re-file the charges, which he did on November 7, 2013, alleging the same facts and violations of law as the prior complaint. *See id.* The complaint, however, was not styled as a "Refiled" Criminal Complaint. *Id.* On April 24, 2014, Judge Pestak dismissed with prejudice the re-filed case, because it was an "improper filing" under Rule 6-506A(C) NMRA. *Id.*, UF ¶ 52; Defs.' Ex. J, ECF No. 47-9.

On September 15, 2014, Plaintiff filed two civil complaints in the Seventh Judicial District Court for the State of New Mexico: one against the NMSP Department and Sierra County and the other against the NMSP Officers and Curtis Cherry. Defs.' Mot., UF ¶ 53, ECF No. 47. Defendants removed the latter case to this Court. *Id.*

## II.   PROCEDURAL HISTORY

Defendant Officers moved for summary judgment based on qualified immunity as to all claims against them. *See* Defs.' Mot. 27, ECF No. 47. In his response to the current motion, Plaintiff "is voluntarily dismissing his claims for unlawful detention without reasonable

suspicion for his detention at the hospital and his arrest without probable cause claim," and "will also voluntarily dismiss any First Amendment claim alleging retaliatory prosecution and any malicious prosecution claim." Pl.'s Resp. 1, ECF No. 52. Plaintiff, however, "continues to maintain his claim to Excessive Force as stated in Count II and his claim to unlawful detention for his prolonged stay in the Sierra County jail as stated in Counts IV and VII of his complaint." *Id.* Plaintiff's excessive force claim is asserted in Count III, not Count II. *See* Compl. ¶¶ 63-67, ECF No. 1-2; Pl.'s Resp. 6, ECF No. 52 ("In Count III of Plaintiff's complaint, he raises a claim of excessive force."). Count II is his unlawful arrest claim. Compl. ¶¶ 55-62, ECF No. 1-2. Accordingly, based on Plaintiff's voluntary dismissal of claims, the Court will dismiss Counts I (Unreasonable Seizure), II (Unlawful Arrest), V (First Amendment Retaliation), and VI (Malicious Prosecution) against the Defendant Officers.

In Count III, Plaintiff alleges the force used against him was unreasonable and in violation of the Fourth Amendment when the Defendant Officers "tackled him, dislodged his IV, and handcuffed Plaintiff while in a wheelchair and seeking medical care," as well as "when they handcuffed Plaintiff to his bed." Compl. ¶¶ 63-64, ECF No. 1-2. Plaintiff asserts in Count IV that Defendant Officers unlawfully detained him at the Sierra County Detention Facility in violation of his Fourth Amendment rights (Count IV) when they failed to properly file a criminal complaint or return of arrest warrant, which would have caused him to be brought before a judge within 48 hours. *See id.* ¶¶ 68-69, 74. In Count VII, Plaintiff contends that the Defendant Officers seized him without due process of law and confined him in jail for 18 days without bringing him before a judge for a probable cause determination. *See id.* ¶¶ 85-87.[6]

---

[6] The undisputed facts show Plaintiff was arrested around 11:54 p.m. on July 6, 2013, and released from custody sometime on July 23, 2013, so by the Court's count, he was detained for approximately 17 days. Defendant Officers, however, admit that "he remained in the custody of SCDC for approximately eighteen days." Defs.' Reply 11, ECF No. 56. Because the one-day difference is immaterial to the Court's decision, the Court will consider the detention to

III.    STANDARD

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  When a defendant raises the qualified immunity defense on summary judgment, the burden shifts to the plaintiff, who must meet a strict two-part test of showing that:  (1) the defendant violated a constitutional or statutory right and (2) the right was clearly established at the time of the conduct.  *See Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000).  As to the first inquiry, the question is whether the facts alleged, which are taken in the light most favorable to the party asserting the injury, show that the officer's conduct violated a constitutional or statutory right.  *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002).

The second inquiry is more specific than whether the officer's conduct violated a constitutional or statutory right; the question is whether it would be clear to a reasonable officer that his conduct was unlawful under the circumstances he confronted.  *Saucier v. Katz*, 533 U.S. 194, 202 (2001).  "[T]he right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." *Wilson v. Layne*, 526 U.S. 603, 615 (1999) (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).  Moreover, "in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012) (quoting *Klen v. City of Loveland, Colo.*, 661 F.3d 498, 511 (10th Cir. 2011)).  The essence of the second prong is whether the state of the law at the time of the incident gave the defendants "fair

have been 18 days.

warning" that their alleged conduct was unconstitutional. *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014). "Even when the plaintiff pleads a violation of a clearly established right, the court must sometimes consider 'whether extraordinary circumstances—such as reliance on the advice of counsel or on a statute—so prevented the official from knowing that his or her actions were unconstitutional that he or she should not be imputed with knowledge of a clearly established right.'" *Wilson v. Montano*, 715 F.3d 847, 852 (10th Cir. 2013) (quoting *Shero v. City of Grove*, 510 F.3d 1196, 1204 (10th Cir.2007)).

If the plaintiff establishes both elements of the qualified immunity test, then the burden shifts back to the defendant to show there are no genuine issues of material fact and that he is entitled to judgment as a matter of law. *See Tolan*, 134 S.Ct. at 1866; *Nelson*, 207 F.3d at 1206. Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995) (quoting Fed. R. Civ. P. 56(c)). The court must view all facts and reasonable inferences in the light most favorable to the nonmoving party. *Tolan*, 134 S.Ct. at 1866.

## IV. ANALYSIS

### A. Excessive Force (Count III)

Claims of excessive force are analyzed under the objective reasonableness standard of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 395-97 (1989). The reasonableness of the officer's belief as to the appropriate level of force should be judged from the perspective of an officer on the scene, rather than with the 20/20 vision of hindsight. *Id.* at 396. Among the factors that courts should consider in determining whether a police officer applied excessive

force are (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Id.* at 396.

Inherent in an officer's authority to make an arrest or detention is the authority to use reasonable force to effectuate the arrest or detention. *See Muehler v. Mena*, 544 U.S. 93, 98-99 (2005). As the Tenth Circuit explained:

> [T]he excessive force inquiry evaluates the force used in a given arrest or detention against the force reasonably necessary to effect a lawful arrest or detention under the circumstances of the case. Thus, in a case where police effect an arrest without probable cause or a detention without reasonable suspicion, but use no more force than would have been reasonably necessary if the arrest or the detention were warranted, the plaintiff has a claim for unlawful arrest or detention but not an additional claim for excessive force.

*Cortez v. McCauley*, 478 F.3d 1108, 1126 (10th Cir. 2007). An officer may handcuff an individual suspected of a petty misdemeanor during an investigative detention if he has reason to be concerned for his safety or a need to control the situation. *See Fisher v. City of Las Cruces*, 584 F.3d 888, 893-96 (10th Cir. 2009). *See also Morris,* 672 F.3d at 1192 ("We have approved both a takedown and the use of handcuffs during the course of a *Terry* stop, where the officers reasonably feared for their safety."). If an officer has a reasonable, but mistaken, belief that a suspect is likely to fight back, the officer may be justified in using more force than in fact was needed. *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008).

The Tenth Circuit has required a showing of actual, non-de minimis injury, be it physical or emotional, in a handcuffing case, in order to recover on an excessive force claim. *Fisher*, 584 F.3d at 894 (quoting *Cortez*, 478 F.3d at 1129 n.5). Assessing whether the degree of force used in a handcuffing case can be difficult because "in nearly every situation where an arrest is authorized, or police reasonably believe public safety requires physical restraint, handcuffing is

14

appropriate." *Id.* at 896. Where the handcuffing is permissible, but the manner of handcuffing may render the application of force excessive, the Tenth Circuit has instructed that "an examination of the resulting injury supplements" the inquiry. *Id.* at 896-97. Nevertheless, excessive force cases do not require proof of physical harm, such as visible cuts or bruises, and may include emotional harm, in order to protect a person's "liberty, property, and privacy interests – a person's sense of security and individual dignity." *Id.* at 897-98 (quoting *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1195 (10th Cir. 2001)).

The Court must first determine the scope of Plaintiff's excessive force claim. Although providing evidence in his response in the disputed fact section that Officer White choked him during the encounter, Plaintiff has focused his excessive force legal argument entirely on the initial takedown and handcuffing – tackling him out of his wheelchair, dislodging the IV, and handcuffing him. *See* Pl.'s Resp. 6-8, ECF No. 52. Plaintiff's complaint and the Joint Status Report similarly rely on the takedown and handcuffing as the basis for his excessive force claim. *See* Compl. ¶ 63, ECF No. 1-2 ("Defendants' level of force was objectively unreasonable when they tackled him, dislodged his IV, and handcuffed Plaintiff while in a wheelchair and seeking medical care."); *id.* ¶ 64 ("Defendants' level of force was objectively unreasonable when they handcuffed Plaintiff to his bed."); Joint Status Report 3-4, ECF No. 16 (explaining that officers "tackled Plaintiff to the ground, kneed him, and dislodged his IV" and "did handcuff Plaintiff and restrained him to a hospital bed").

Moreover, the three cases cited by Plaintiff in support of his argument that the takedown was excessive were likewise cases in which the suspect was handcuffed or seized in a manner that exacerbated prior injuries. *See Fisher*, 584 F.3d at 891-92 (reversing qualified immunity where jury could find that officers' handcuffing of man who had shot himself exacerbated his

injuries unreasonably by causing him excruciating pain); *Walton v. City of Southfield*, 995 F.2d 1331, 1342 (6th Cir. 1993) (finding fact issue precluded qualified immunity on whether officers' handcuffing of suspect with shoulder injury that caused further pain was excessive); *Guite v. Wright*, 147 F.3d 747, 750 (8th Cir. 1998) (finding genuine issue of whether force was excessive when officer grabbed plaintiff's wrist, pushed him backwards, and held him against door, and plaintiff had sling on left arm and was recovering from surgery on his shoulder). Because Mr. Diaz has focused his excessive force claim on the forcible takedown and handcuffing, which resulted in the IV dislodging, the Court will likewise focus on only those facts and law argued. *Cf. Morris v. Noe*, 672 F.3d 1185, 1195 (10th Cir. 2012) ("Although Plaintiff has introduced evidence the officers "fell into [Morris's] midsection and back" and "picked [him] up three times by the handcuffs," Plaintiff has focused her excessive force claim entirely on the initial tackle or "throw down." Accordingly, we too focus there."); *Hawker v. Sandy City Corp.*, 591 F. App'x 669, 672 (10th Cir. 2014) (unpublished opinion) ("The Hawkers are not claiming Albrand's yanking C.G.H. from the floor by his arm constitutes excessive force. Nor are they challenging the existence of probable cause to arrest him for theft or the use of handcuffs in the arrest. The only issue is whether Albrand's use of a twist-lock to effectuate the arrest constitutes excessive force under the Fourth Amendment."). Consequently, to overcome the Defendant Officers' qualified immunity defense, Mr. Diaz must show that it was clearly established as of July 6, 2013, that the Defendant Officers' use of force in tackling Mr. Diaz out of the wheelchair while hooked to an IV, and handcuffing him while the officers put their knees on the back of his head, which caused Mr. Diaz to feel like he was choking and caused his IV to be dislodged, was excessive and beyond the amount of force appropriate when executing an investigative detention or arrest.

The first factor – the severity of the crime – weighs slightly in Defendants' favor. Defendants had probable cause to believe Mr. Diaz had battered another person and committed criminal damage to property, crimes of violence. The charges in the warrant, however, were for a petty misdemeanor (battery) and a misdemeanor (tampering or injuring a vehicle), *see* Warrant, ECF No. 47-8 at 4 of 8, so the severity of the crimes was not great under the law. *Cf. Morris*, 672 F.3d at 1195 (holding that first factor weighed slightly in defendant's favor where crime was assault, "by no means an insignificant offense," but where Oklahoma law treated it as a misdemeanor); *Fisher*, 584 F.3d at 895 (concluding that crime of firing firearm within city limits was not severe because it was only a petty misdemeanor).

As to the second factor, it is undisputed that Mr. Diaz was aggressive, appeared to be drunk, is a large man, was acting loudly and obnoxiously, and was looking for a fight at the Park. It is also undisputed that, at the Park, Mr. Diaz acted extremely aggressively toward Sgt. Romero that caused him and other officers to fear for their safety. Mr. Diaz does not dispute that he was the person cursing the officers in the audio recording when they entered the hospital room and asked to talk to him. Based on Mr. Diaz's aggressive conduct at the Park, his seeming intoxication, the local officers' warnings that Plaintiff would likely fight them at the hospital, and Mr. Diaz's continued verbal hostility towards the officers that he exhibited when they entered the room, the officers had reason to be concerned for their safety. The second factor thus weighs in favor of Defendants as to their belief that they would need to use some degree of force to carry out the seizure.

The third factor – whether Plaintiff was actively resisting arrest – also weighs in favor of the Defendant Officers, despite that the parties' versions of events differ. Even assuming Mr. Diaz did not physically resist the officers and did not pull his arm away when Officer White

attempted to handcuff him, it was not clearly established at the time that the takedown of Mr. Diaz in order to handcuff him was not justified and reasonable. Based on the undisputed facts, the officers had reason to fear for their safety and be concerned that Mr. Diaz would fight and resist their attempts to handcuff him, given Mr. Diaz's belligerence and intoxication at the Park, including assaultive conduct against Sgt. Romero, and the Truth or Consequences police information that he was likely to fight them. They also had reason to restrain him to control the situation in order to bring Mr. Beltran into the hospital. As soon as they entered the room, Mr. Diaz yelled obscenities at Sgt. Romero. When an officer moved to handcuff him, Mr. Diaz aggressively told the officer: "You gonna handcuff me? Fuck you. You ain't fuckin' gonna handcuff me. Fuck no, mother fucker." *See* Defs.' Ex. F, Hospital Recording, 2:50-3:35. Reasonable officers could believe that Mr. Diaz's statements amounted to verbal resistance, indicating that he would resist handcuffing. *See Pride v. Does*, 997 F.2d 712, 717 (10th Cir. 1993) ("[T]he relevant question for the court is not whether [the suspect] acted in a threatening manner but whether [the officer] reasonably believed so."). Under these circumstances, it would not have been clear that they could not forcibly take him down, even though he was in a wheelchair, hooked to an IV.

Plaintiff relies on the *Fisher* case to show that it was clearly established that using a forcible takedown to an injured person was unreasonable. *Fisher*, however, is readily distinguishable. There, the suspect presented no threat to the police, had suffered two gunshot wounds, and he begged not to be handcuffed behind his back because it was causing him excruciating pain. *See Fisher*, 584 F.3d at 892, 895-96. In contrast, here the undisputed evidence gave the officers reason to believe Mr. Diaz presented a threat to them and Mr. Beltran. It is also undisputed that Mr. Diaz verbally told the officers, captured in the audio recording, that he was

not going to let them handcuff him.

This case is more on point with *Pride*, in which the Tenth Circuit concluded that the officer's action in choking the suspect by placing her left hand around his neck for approximately 30 seconds, which was unpleasant, painful pressure that reduced the suspect's ability to breathe and speak, was objectively reasonable under the circumstances. *See Pride*, 997 F.2d at 714-15. The Tenth Circuit, in determining that the plaintiff failed to show that the officer acted unreasonably in response to the perceived threat to her safety and the safety of others in the room, reasoned as follows:

> Officer Lamb encountered an intoxicated and provocative individual who was in custody for disorderly conduct. When that individual acted in a manner which she reasonably perceived as threatening, she used moderate force to restrain him. The record reveals that that individual sustained minimal immediate injury and no permanent injury whatsoever as a result of that application of force. Under these circumstances, we hold that Officer Lamb's conduct was objectively reasonable. Because Pride failed to show that Lamb violated his Fourth Amendment rights, his § 1983 claim was properly dismissed on summary judgment.

*Id.* at 717 (internal footnote omitted).

As in *Pride*, the officers here encountered an intoxicated, belligerent, large man who had exhibited threatening conduct toward the officers at the Park and who they had reason to believe committed a battery against Mr. Beltran, who they needed to escort into the hospital. Moreover, like *Pride*, the lack of evidence of injury also weighs in favor of the conclusion that the officers did not use excessive force during the takedown. The only physical injury in the record is that the IV pulled out of Mr. Diaz's arm during the takedown, but he has presented no evidence of pain or discomfort or other injury caused by the IV dislodging. Nor has Mr. Diaz presented any evidence of emotional injury. The minimal immediate injury and the lack of permanent injury as a result of the application of force indicate that the force used was objectively reasonable.

Accordingly, the officers are entitled to qualified immunity because it was not clearly

established that the force used to takedown, handcuff, and restrain Mr. Diaz was unreasonable under the circumstances and the law at the time of the incident. *Cf. Mecham v. Frazier*, 500 F.3d 1200, 1202-05 (10th Cir. 2007) (reversing denial of officers' motion for summary judgment based on qualified immunity and finding officers' use of force objectively reasonable where officers, while investigating suspect driving on suspended license, used pepper spray and physical force to remove suspect who refused repeated commands to exit her car, and put her to the ground and handcuffed her); *Gallegos v. City of Colorado Springs*, 114 F.3d 1024, 1031 (10th Cir. 1997) (holding that use of arm bar maneuver and take-down on aggressive suspect during *Terry* stop was reasonable where suspect was resisting arrest, yelling, angry, and smelled as if he had been drinking); *Hinton v. City of Elwood*, 997 F.2d 774, 781 (10th Cir. 1993) (explaining that wrestling a suspect to the ground may be appropriate when a suspect is resisting arrest and must be handcuffed); *Hawker*, 591 F. App'x at 675 (holding that use of twist-lock removal on small 9-year-old child, which resulted in possible hairline fracture to his collarbone, was objectively reasonable where child's grabbing of officer's arm could reasonably be viewed as resisting arrest). The Court will therefore grant Defendant Officers' summary judgment on Plaintiff's excessive force claim in Count III.

### B.     Unlawful Prolonged Detention in the Sierra County Jail (Counts IV and VII)

The general right of an accused to liberty pending trial finds protections in the Fourth Amendment, the Due Process Clause of the Fourteenth Amendment, and the Eighth Amendment. *See*, *e.g.*, *County of Riverside v. McLaughlin*, 500 U.S. 44, 47 (1991) ("[T]he Fourth Amendment requires a prompt judicial determination of probable cause as a prerequisite to an extended pretrial detention following a warrantless arrest."); *Dodds v. Richardson*, 614 F.3d 1185, 1192 (10th Cir. 2010) ("[T]he right of an accused to freedom pending trial is inherent in the concept of

a liberty interest protected by the due process clause of the Fourteenth Amendment."); *Meechaicum v. Fountain*, 696 F.2d 790, 791 (10th Cir. 1983)) ("Because the practical effect of excessive bail is the denial of bail, logic compels the conclusion that the harm the Eighth Amendment aims to prevent is the unnecessary deprivation of pretrial liberty.").

Plaintiff contends that the Defendant Officers are liable for his 18-day detention at the Sierra County Detention Facility because they had an affirmative duty to bring him before the court without undue delay and for the setting of conditions of release. Plaintiff asserts that his 18-day pre-trial detention without seeing a judge and without a determination of probable cause amounts to a constitutional deprivation under the Fourth Amendment and the Due Process Clause.

### 1.     Fourth Amendment (Count IV)

The Fourth Amendment requires a prompt judicial determination of probable cause as a condition for any significant pretrial detention following a warrantless arrest, although an adversary hearing is not required.  *Baker v. McCollan*, 443 U.S. 137, 142-43 (1979); *Gerstein v. Pugh*, 420 U.S. 103, 114, 120 (1975). Generally, if the judicial determination of probable cause occurs within 48 hours following a warrantless arrest, the promptness requirement is satisfied. *See McLaughlin*, 500 U.S. at 56.

Plaintiff relies on the case of *Wilson v. Montano*, 715 F.3d 847 (10th Cir. 2013), arguing that the arresting officer has a duty to ensure the arrestee receives a prompt probable cause determination. *Wilson*, however, involved a warrantless arrest. *Id.* at 850. The Tenth Circuit held that, under the Fourth Amendment, the arresting officer had a duty under New Mexico law to ensure that the arrestee received a judicial determination of probable cause within 48 hours of his warrantless arrest. *See id.* at 852-55.

21

However, "a person arrested pursuant to a warrant issued by a magistrate on a showing of probable-cause is not constitutionally entitled to a separate judicial determination that there is probable cause to detain him pending trial," because "the probable cause standard for pretrial detention is the same as that for arrest." *Baker*, 443 U.S. at 143. Consequently, "[a]bsent an attack on the validity of the warrant," an accused deprived of liberty for a period of days pursuant to a valid warrant does not have a § 1983 claim based on the Fourth Amendment. *See id.* at 143-44. Here it is undisputed that Officer Crayton obtained telephonic approval of the arrest warrant from Judge Pestak; Officer Crayton provided a copy of the warrant and affidavit to jail staff on July 7, 2013; and on July 8, 2013, the NMSP officers filed the warrant and affidavit with the court.

In his response to the Defendant Officers' motion for summary judgment, Plaintiff does not argue that the warrant was not valid. However, Defendant Officers, in their motion for summary judgment, adopt former Defendant Curtis Cherry's motion for summary judgment. In the briefing on Defendant Cherry's motion for summary judgment, the parties raised and argued the issue of the validity of the warrant. Plaintiff asserted that the warrant was not facially valid because it was not signed by Judge Pestak; New Mexico does not allow for telephonic arrest warrants not signed by a judge; and thus, his arrest amounted to a warrantless arrest, requiring a judicial determination of probable cause within 48 hours. Although it is unclear if Plaintiff continues to refute the validity of the warrant, in an abundance of caution, the Court will consider the arguments raised by Plaintiff in the briefing on Defendant Cherry's motion for summary judgment.

Under New Mexico Rule of Criminal Procedure 6-204(C), which governs the "Form" for the issuance of an arrest warrant, "[t]he warrant shall be signed by the court." N.M. Rule Crim.

22

P. 6-204(C). The New Mexico Court of Appeals held that the signature requirement for arrest warrants is mandatory and that an unsigned *arrest* warrant violates Rule 5-208(B) and provides an invalid basis for arrest. *State v. Gurrola*, 1995-NMCA-138, ¶ 9, 908 P.2d 264. The New Mexico Court of Appeals suppressed evidence seized at the time of the arrest under the New Mexico Constitution, because the New Mexico Constitution does not allow good faith reliance on an invalid warrant. *Id.* ¶ 10. The court therefore held: "The bench warrant upon which Defendant was arrested was not properly signed and was issued without the due process of law. The warrant was therefore invalid. Under the New Mexico Constitution, evidence must be suppressed when seized pursuant to an arrest based upon an invalid warrant." *Id.* ¶ 11.

On June 10, 2013, shortly before the events at issue here, the New Mexico Supreme Court issued its opinion in *State v. Boyse*, in which it held that a *search* warrant could be requested and issued telephonically. 2013-NMSC-024, ¶ 1, 303 P.3d 830. In *Boyse*, the magistrate judge administered an oath to the officer over the telephone, the officer read the entire written affidavit verbatim, the magistrate judge approved the search warrant over the telephone, and the officer noted the approval on the search warrant form. *Id.* ¶ 4. Several days after the officer executed the search warrant, the officer obtained the magistrate judge's actual signature and initials on the search warrant and affidavit. *See id.*; *State v. Boyse*, 2011-NMCA-113, ¶ 3, 265 P.3d 1285.

In *Boyse*, the New Mexico Supreme Court explained that it had recently amended its rules for criminal procedure for the district courts to recognize the process of requesting and approving search warrants through remote means, including by telephone, and noted that it had also amended the criminal procedure rule for the magistrate courts to permit the remote issuance

of search warrants, effective July 15, 2013. *See Boyse*, 2013-NMSC-024, ¶ 12.[7] Recognizing that

the rules were silent as to the methods for requesting a search warrant in 2008, the court

explained that the issue before it "is whether telephonic approval of search warrants was allowed

because at the time the rules did not expressly disallow the issuance of a search warrant

telephonically." *See id.* ¶¶ 12-13. The Supreme Court concluded that the probable cause

statement must be presented to the magistrate by an officer, under oath, prior to its issuance, but

the "showing" could be by audio, visual, or other sensory means. *Id.* ¶ 15. Consequently, the

court held that the telephonic approval of the search warrant did not violate the Fourth

Amendment or New Mexico Constitution and was valid. *Id.* ¶ 31.

Defendants argue that, in light of *Boyse*, Judge Pestak's telephonic approval of the arrest

warrant was valid, despite that he did not personally sign the warrant. Plaintiff, however,

contends that *Boyse* is limited to search warrants and its holding cannot extend to arrest warrants

because the arrest warrant procedural rules, unlike the search warrant procedural rules, expressly

require that "[t]he warrant shall be signed by the court," Rule 6-204(C) NMRA.

Assuming that the arrest warrant was infirm under New Mexico state law for the lack of a

signature, the Court nonetheless concludes that Defendant Officers are entitled to qualified

immunity because it was not clearly established that their actions violated the Fourth

Amendment. The Tenth Circuit recently concluded that nothing in the text of the Fourth

Amendment expressly conditions the validity of a warrant on it being signed. *United States v.*

*Cruz*, 774 F.3d 1278, 1285 (10th Cir. 2014) (quoting with approval *United States v. Lyons*, 740

---

[7] Effective July 15, 2013, eight days after the events here, the New Mexico Supreme Court amended Rule 6-204(A) to "permit a request for an arrest warrant by any method authorized by Paragraph G of Rule 6-208 NMRA for search warrants and may issue an arrest warrant remotely provided the requirements of Paragraph H of Rule 6-208 NMRA and this rule are met." NMRA 6-204(A), Official Comment, & Statutory Notes. Rule 6-208(H)(3) provides that, if the judge issues the warrant remotely, "it shall be transmitted by reliable electronic means to the affiant and the judge shall file a duplicate original with the court." Rule 6-208(H)(3) NMRA. "Any signatures required under this rule by the judge or affiant may be by original signature, a copy of an original signature, a computer generated signature or any other signature otherwise authorized by law." Rule 6-208(H)(3) NMRA.

F.3d 702, 724 (1st Cir. 2014)). Instead, the Fourth Amendment requires that a warrant "issue," which is satisfied if the magistrate in fact performs the substantive tasks of determining probable cause and authorizing the issuance of the warrant. *Id.* at 1289.

The Court recognizes that *Cruz*, and the cases upon which it relied, concerned the issuance of a search warrant. The Tenth Circuit noted in *Cruz* that no federal or state rules of criminal procedure require that a search warrant be signed, in contrast to an arrest warrant which must be signed under Federal Rule of Criminal Procedure 4(b)(1)(D). *See id.* at 1285. Nevertheless, the Tenth Circuit concluded that there is no constitutional mandate in the Fourth Amendment requiring a signature on a warrant for the warrant to issue. Plaintiff has not provided the Court with authority showing that it is clearly established that the lack of a signature on an arrest warrant supports a Fourth Amendment claim where the state statutes under which it was issued require a signature to be valid.[8] Rather, a number of cases indicate that the holdings of the search warrant cases that an unsigned warrant does not offend the Fourth Amendment similarly may apply in the context of unsigned arrest warrants. *Compare Burke v. Town of Walpole*, 405 F.3d 66, 78 (1st Cir. 2005) (holding that, although police could not produce signed copy of arrest warrant, there was no genuine dispute regarding whether a neutral magistrate had reviewed the facts establishing probable cause and issued the warrant, and thus, record failed to support plaintiff's allegation that he was deprived of his constitutional right to be arrested at home only upon issuance of warrant); *Gadson v. Chatham County Sheriff Dept.*, No. CV 409-029, 2009 WL 1288866, at *2-3 (S.D. Ga. May 8, 2009) (holding that prolonged detention based on arrest upon unsigned arrest warrant did not state claim because such warrants were not necessarily deficient

---

[8] *Compare United States v. Beals*, 698 F.3d 248 263-64 (6th Cir. 2012) (explaining that validity of a search warrant obtained by state officers is to be tested by requirements of Fourth Amendment, not by state law standards, when admissibility of evidence in federal court is at issue because exclusionary rule emanates from Fourth Amendment, not state law).

in constitutional sense where plaintiff never alleged arresting officer lacked probable cause or that there was never a judicial determination of probable cause); *with Perrin v. City of Elberton, GA*, No. 3:03-CV-106(CDL), 2005 WL 1563530, at *8-9 (M.D. Ga. July 1, 2005) ("In this case, Plaintiff claims that what purported to be a warrant under which he was arrested was facially invalid-and therefore insufficient to meet the warrant requirement-because it had not been signed by a judge…. The Fourth Amendment contains no explicit signature requirement…. It may be objectively reasonable for an officer who participated in every step of the process-prepared a warrant application, swore to it before the judge, answered the judge's questions, heard the judge indicate that the warrant was approved, and received the warrant application back from the judge-to rely upon an unsigned warrant. In such a case, the judge has clearly communicated a finding of probable cause. In this case, however, no such communication was made.").[9]

It is undisputed here that Judge Pestak, a neutral magistrate, determined there was probable cause to arrest Mr. Diaz after he swore in Officer Crayton over the telephone, and after Officer Crayton read him the affidavit over the telephone. It is undisputed that Judge Pestak instructed Officer Crayton to note Judge Pestak's telephonic approval on the warrant and to put the bond amount at $5,000, which Officer Crayton did. In light of *Cruz* and the aforementioned authority from other circuits, it is not clearly established that Officer Crayton's reliance on Judge Pestak's telephonic determination of probable cause and verbal authorization to sign the warrant

---

[9] The Seventh Circuit has observed, in the context of arrest warrants, that "[i]ssuing a warrant is not synonymous with signing a warrant." *United States v. Hondras*, 296 F.3d 601, 603 (7th Cir. 2002). In *Hondras*, the Seventh Circuit considered whether, even if probable cause exists, only a judge, not a clerk of the court, may sign a valid arrest warrant revoking a defendant's supervised release given that 18 U.S.C. § 3606 requires a court to issue a warrant upon probable cause that a person violated the conditions of release. *Id.* at 602. The court compared Federal Rule of Criminal Procedure 4(b)(1)(D), which requires a judge's signature for arrest warrants issued pursuant to criminal complaints, with Rule 9, which states that warrants for defendants named in indictments must still be issued by a judge, but may be signed by the clerk of the court. *Id.* at 602-03. The Seventh Circuit concluded: "Unless a relevant statute or rule of procedure directs otherwise, if a judge finds probable cause to believe that a person has violated his supervised release and directs a clerk of the court to sign an arrest warrant, as happened in this case, the court has validly issued that warrant. The requirements of both the Fourth Amendment and § 3606 are satisfied in this case." *Id.* at 603.

for him did not satisfy his obligations under the Fourth Amendment to ensure that an arrestee receive a prompt judicial determination of probable cause.

Furthermore, the undisputed fact that Judge Pestak told Officer Crayton that it was unnecessary to contact another district judge to approve the warrant, because Judge Pestak could telephonically approve the warrant, is a highly significant fact supporting the conclusion that the Defendant Officers acted with an objectively reasonable belief that they were acting in accordance with the Fourth Amendment. In *Massachusetts v. Sheppard*, an officer presented a search warrant and affidavit to a judge, knowing that the warrant form was for controlled substances and needed some alterations for a search for items related to a homicide. *See Massachusetts v. Sheppard*, 468 U.S. 981, 986 (1984). The judge informed the officer that he would make the necessary changes so as to provide a proper search warrant, reviewed the affidavit and warrant, dated and signed the warrant, and told the officer that the warrant was sufficient authority to carry out the search. *See id.* The judge, however, did not alter the form to incorporate the affidavit, so the substantive portion of the warrant continued to authorize a search for controlled substances. *Id.* The Supreme Court considered whether there was an objectively reasonable basis for the officers' mistaken belief that the search was authorized by a valid warrant. *See id.* at 988. The Supreme Court determined that a reasonable police officer would have concluded that the warrant authorized a search for the materials outlined in the affidavit. *Id.* at 989. In so holding, the Supreme Court "refuse[d] to rule that an officer is required to disbelieve a judge who has just advised him, by word and by action, that the warrant he possesses authorizes him to conduct the search he has requested." *Id.* at 989-90. As the Supreme Court concluded, "In sum, the police conduct in this case clearly was objectively reasonable and largely error-free. An error of constitutional dimensions may have been committed with respect

to the issuance of the warrant, but it was the judge, not the police officers, who made the critical mistake." *Id.* at 990.

Applying that reasoning here, Plaintiff has not met his burden of demonstrating that it would have been clear to a reasonable officer on July 7, 2013, under circumstances in which Judge Pestak telephonically authorized the warrant after finding probable cause and assured the officer that he could telephonically approve the warrant, that the officer had not satisfied the Fourth Amendment's judicial determination of probable cause requirement within 48 hours of arrest. Accordingly, the Court will grant qualified immunity to Defendant Officers on Count IV. The Court will next turn to Plaintiff's claim that the Defendant Officers' failure to bring him to court without undue delay violated his due process rights. *See Gaylor v. Does*, 105 F.3d 572, 574-75 (10th Cir. 1997) (explaining that, where arrest is made on probable cause warrant and after judicial determination of probable cause, due process, not Fourth Amendment, regulates period of confinement after initial determination of probable cause).

### 2. Due Process Clause (Count VII)

The Due Process Clause of the Fourteenth Amendment provides that no State may "deprive any person of life, liberty, or property, without due process of law...."  U.S. Const. am. XIV. The Due Process Clause protects individuals against two types of governmental action:  (1) "substantive due process" prevents the government from engaging in action that "shocks the conscience" or "interferes with rights implicit in the concept of ordered liberty," and (2) "procedural" due process ensures that government action is implemented in a fair manner.  *See United States v. Salerno*, 481 U.S. 739, 746 (1987) (internal quotations omitted) (discussing Fifth Amendment Due Process Clause). For procedural due process, the plaintiff must show a deprivation of an interest in life, liberty, or property, and that the procedures followed by the

government in depriving the plaintiff of that interest did not comport with due process of law. *See Elliott v. Martinez*, 675 F.3d 1241, 1244 (10th Cir. 2012). Protected liberty interests arise from the Due Process Clause itself and the laws of the States. *Id.* For state laws to create a protected liberty interest, the right must be mandated by state law when specified substantive predicates exist. *Id.*

Defendant Officers contend that their conduct does not rise to the level of conduct that "shocks the conscience" to give rise to liability under § 1983 for violation of the Due Process Clause. They argue that New Mexico state law at the time required a custodial defendant to be arraigned within 30 days of arrest, and thus, a reasonable officer would not have known that waiting for 18 days to bring Plaintiff before a judge would violate his due process rights where Plaintiff was arrested on a warrant issued by a judge upon a determination of probable cause and the judge set a $5,000 bond. Finally, the Defendant Officers contend that they were not personally responsible for Plaintiff's continued detention because they relinquished Plaintiff's custody to the jail on July 7, 2013, and promptly filed the criminal complaint, warrant, and supporting affidavit.

Plaintiff asserts that New Mexico law requires an officer to bring a defendant named in a warrant to court "without unnecessary delay." *See* N.M. Stat. Ann. § 31-1-4 ("When a warrant is issued in a criminal action, it shall be directed to a law enforcement officer, and the defendant named in the warrant shall, upon arrest, be brought by the officer before the court without unnecessary delay."); N.M. Stat. Ann. § 31-1-5 ("Every accused shall be brought before a court having jurisdiction to release the accused without unnecessary delay."). Plaintiff further contends that under state law a defendant accused of a bailable offense may not be held without the setting of conditions of release. Under Rule 6-202(A), a preliminary hearing must be held "within a

29

reasonable time but in any event not later than ten (10) days after the first appearance if the defendant is in custody…." Rule 6-202(A), NMRA. Plaintiff argues that he was entitled not only to a probable cause determination by a magistrate judge within 48 hours, as set forth in *Wilson*, but also to "the additional state-based protection of a preliminary hearing within 10 days of that initial appearance." Pl.'s Resp. 11, ECF No. 52. Plaintiff thus asserts that New Mexico requires that an in-custody criminal defendant be afforded a preliminary hearing at a minimum within 12 days of arrest and the return of the arrest warrant, and that the Defendant Officers' failure to bring him to court for 18 days amounted to unnecessary delay that violated his due process rights. *See* Pl.'s Resp. 11-12, ECF No. 52.

The Tenth Circuit recently rejected the similar argument that an officer's failure to return a warrant that resulted in approximately 20 days passing before a pretrial detainee in custody at a hospital received a judicial hearing deprived the detainee of procedural due process. *Cordova v. City of Albuquerque*, __ F.3d __, 2016 WL 873347, *2, 8-9 (10th Cir. 2016). The reasoning of the Tenth Circuit applies here:

> Cordova relies on our recent precedent that an arrestee has a right to a probable-cause hearing within forty-eight hours of arrest. *Wilson v. Montano*, 715 F.3d 847 (10th Cir.2013). But that case establishes no such requirement. As the Supreme Court made clear in *Gerstein v. Pugh*, 420 U.S. 103, 120, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), an arrestee has a constitutional right to a prompt probable cause determination, not to any particular kind of adversary hearing. Probable cause "can be determined reliably without an adversary hearing" and that standard, reason to believe the suspect has committed a crime, "traditionally has been decided by a magistrate in a nonadversary proceeding on hearsay and written testimony, and the Court has approved these informal modes of proof." *Id. Wilson* is not to the contrary. At no point did we recognize a right to a hearing, as Cordova argues. Rather, we simply acknowledged the Supreme Court's recognition of the right to a judicial determination of probable cause. *See* 715 F.3d at 852–53 (citing *Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 56, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991); *Gerstein*, 420 U.S. at 114).

> Here, a neutral magistrate judge determined there was probable cause to detain Cordova within a day of his arrest and signed a warrant for his arrest. Cordova has

made no suggestion that this procedure was in conflict with the Supreme Court's prior cases approving probable cause determinations made "by a magistrate in a nonadversary proceeding." *Gerstein*, 420 U.S. at 120. Cordova received his probable cause determination, and the Constitution requires nothing else within forty-eight hours of arrest.

We also are unpersuaded by Cordova's contention that New Mexico law creates a liberty interest, constitutionally protected or otherwise, in a preliminary hearing within twelve days of arrest. In short, he argues that Rule 6–202(D) of the New Mexico Rules Annotated requires a preliminary hearing within ten days of the "initial hearing" and, under *Wilson* and *Gerstein*, the initial hearing must be within two days of arrest. He thus concludes that state law establishes a right to a preliminary hearing within twelve days. As discussed above, however, neither *Wilson* nor *Gerstein* require any kind of hearing within two days of arrest—the initial hearing described in Rule 6–202(D) is an entirely different matter. In fact, New Mexico law sets no specific time limit on initial appearances, requiring only that they be held "without unnecessary delay." N.M. Stat. Ann. § 31–1–5(B). This standard allows for considerable discretion and thus cannot be the basis of a constitutionally protected liberty interest. *See Ky. Dep't of Corr.* [*v. Thompson*, 490 U.S. 454, 461 (1989).]

Cordova has not identified any constitutionally protected liberty interests which could support his claim that he was deprived of timely legal process. As discussed above, an arrestee is not constitutionally entitled to a probable-cause hearing within forty-eight hours of arrest where a neutral magistrate has already made a probable cause determination. Nor does anything in New Mexico law establish a right to a preliminary hearing within twelve days of arrest. The district court did not err in dismissing this claim.

*Id.* at *9.

The *Cordova* case forecloses Plaintiff Diaz's argument that New Mexico law, as set forth in Sections 31-1-4 and 31-1-5 and Rule 6-202(A), creates a constitutionally protected liberty interest that Defendant Officers violated. Section 31-1-4's language to bring a defendant named in an arrest warrant before a court "without unnecessary delay" does not sufficiently limit official discretion to create a constitutionally protected liberty interest to an initial appearance within 18 days of arrest. *See id.* Furthermore, at the time of the incident, Rule 6-506(A) provided that a "defendant shall be arraigned on the complaint or citation within thirty (30) days after the filing of the complaint or citation or the date of arrest, whichever is later." Rule 6-506(A), NMRA

(2008).[10] The New Mexico rules for magistrate courts contemplate that the arraignment "shall" occur at the first appearance "[i]f the offense charged is within the court's trial jurisdiction." Rule 6-501(B) NMRA ("If the offense charged is within the court's trial jurisdiction, the court shall require the defendant to plead to the complaint, pursuant to Rule 6-302 NMRA …."). Officer Crayton charged Mr. Diaz with misdemeanor charges, and thus, those charges were within the magistrate court's jurisdiction, and under state law, the arraignment and initial appearance shall occur at the same time. Given the discretionary language in Section 31-1-4 and the 30-day window for arraignment in Section 6-506(A), New Mexico law did not create a constitutionally protected liberty interest to an initial appearance or preliminary hearing within 12 (or before 18) days of arrest where the detainee received a judicial determination of probable cause prior to or within 48 hours of arrest. The Court will therefore dismiss Plaintiff's procedural due process claim.

To the extent Plaintiff has raised a substantive due process claim, that claim must also be dismissed, because Plaintiff has not met his burden to show that the Defendant Officers violated substantive due process or that such a right was clearly established by the Supreme Court or Tenth Circuit. In his response to Defendant Cherry's motion for summary judgment, Plaintiff cites two out-of-circuit cases for the proposition that a prolonged detention offends due process: *Armstrong v. Squadrito*, 152 F.3d 564, 573 (7th Cir. 1998); and *Hayes v. Faulkner County*, 388 F.3d 669 (8th Cir. 2004). *See* Pl.'s Resp. 10, ECF No. 42. Both the Seventh and Eighth Circuits have applied a three-part test in the prolonged pretrial detention context (1) whether the Due Process Clause prohibits an extended detention, without an initial appearance, following an arrest pursuant to valid warrant; (2) whether defendants' conduct offended the standards of substantive

---

[10] Effective December 31, 2013, after the events at issue here, Rule 6-506(A) was amended to add the sentence: "A defendant in custody shall be arraigned on the complaint or citation as soon as practical, but in any event no later than four (4) days after the date of arrest." Rule 6-506(A) (2013) & Committee commentary.

due process; and (3) whether the totality of the circumstances shocks the conscience. *Hayes*, 388 F.3d at 673 (citing Armstrong, 152 F.3d at 570). With respect to the second prong, the Seventh and Eighth Circuits applied a deliberate indifference standard, defined as a conscious disregard of known and obvious dangers. *See Hayes*, 388 F.3d at 674; *Armstrong*, 152 F.3d at 577.

In *Armstrong*, the Seventh Circuit found the fact that the detainee "protested the lack of a prompt appearance" to be "an important factor" in finding the delay in an initial appearance to abridge his substantive due process rights because "the Supreme Court conspicuously noted it in *Baker v. McCollan*." *Armstrong*, 152 F.3d at 575-76. Indeed, the Supreme Court stated: "Obviously, one in respondent's position could not be detained indefinitely *in the face of repeated protests of innocence* even though the warrant under which he was arrested and detained met the standards of the Fourth Amendment." *Baker*, 443 U.S. at 144 (emphasis added). The Seventh Circuit, in analyzing the deliberate indifference prong, determined that plaintiff's claims against the prison guards survived on summary judgment based on evidence of their repeated refusal to transmit the detainee's complaints to jail authorities. *See Armstrong*, 152 F.3d at 580. The Eighth Circuit in *Hayes* likewise placed significance on the fact that the detainee hand-wrote a grievance to the jail administrator, which the jail administrator received and ignored. *See Hayes*, 388 F.3d at 672. The Eighth Circuit concluded that the jail administrator's conscious disregard of the detainee's prolonged detention without a court appearance amounted to deliberate indifference violating the standards of due process. *See id.* at 674.

In contrast, in this case there is no evidence that Plaintiff made repeated protests of innocence or repeated requests to go to court that the Defendant Officers knew of and ignored. There are no other facts that indicate that Defendant Officers acted with deliberate indifference, or a conscious disregard of known or obvious dangers, the standard which both the Seventh and

Eighth Circuits required in order to find a substantive due process violation in this context. Accordingly, Plaintiff has not met his burden to demonstrate that the Defendant Officers violated substantive due process under the authorities he cited.

Plaintiff also has not met his burden on the second prong of the qualified immunity test to show that it was clearly established in the Tenth Circuit that the Defendant Officers' failure to take Plaintiff to court before 18 days elapsed was unlawful and conscience-shocking. Plaintiff has not cited any Tenth Circuit law on prolonged detentions in this context. The *Armstrong* case he referenced involved a 57-day detention between arrest and an initial appearance, while the Eighth Circuit case involved a 38-day delay, far longer than the 18-day detention here. *See Armstrong*, 152 F.3d at 157; *Hayes*, 388 F.3d at 673. Although the Seventh Circuit in *Coleman v. Frantz* found a due process violation in an 18-day delay between detention and initial appearance, in that case the detainee was incarcerated "in the face of repeated protests of innocence and requests to go to court." 754 F.2d 719, 723-24 (1985). The totality of the circumstances here distinguish this case from the out-of-circuit cited authority: the discretionary language in Section 31-1-4; the 30-day window for arraignment in Section 6-506(A); Plaintiff had been arrested upon a warrant issued by a judge; the warrant provided a bond amount; the officer filed the return of arrest warrant, affidavit and the criminal complaint in court within 48 hours of arrest; the lack of evidence that Plaintiff made any protests concerning the delayed initial appearance; and the lack of evidence that Defendant Officers were aware of Plaintiff's prolonged detention or were otherwise deliberately indifferent to his plight. This Court cannot conclude that the weight of authority would have made it clear to the Defendant Officers that their conduct shocked the conscience in a way that violated a clearly established due process right of Plaintiff. Because Defendant Officers did not have "fair warning" that their alleged

34

conduct was unconstitutional, Defendant Officers are entitled to qualified immunity on Plaintiff's due process claim in Count VII.

**IT IS THEREFORE ORDERED** that

1.     Defendants' Motion for Summary Judgment on Qualified Immunity (**ECF No. 47**) is **GRANTED**;

2.     Counts I, II, V, and VI against the Defendant Officers are **DISMISSED** based on Plaintiff's voluntary dismissal.

3.     Defendant Officers are entitled to summary judgment and qualified immunity on Counts III, IV, and VII.

4.     Counts III, IV, and VII are **DISMISSED WITH PREJUDICE**.

5.     Because all claims against New Mexico State Police Officers Jason Wright, Matthew Romero, Cory Crayton, and John White are **DISMISSED**, and they are the only remaining defendants, this case is **DISMISSED**.


_____
**UNITED STATES DISTRICT JUDGE**